IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FILED

02 MAY 31  PM 4: 12

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| ANTONIA TOLBERT, et. al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. CV-01-C-1407-W |
| MONSANTO COMPANY, | ) | |
| PHARMACIA CORPORATION | ) | |
| and SOLUTIA, INC., | ) | |
| | ) | |
| Defendants. | ) | JURY TRIAL DEMANDED |

## NINTH AMENDED COMPLAINT

**COME NOW** the Plaintiffs, and for their complaint against Monsanto Company ("Monsanto"), Pharmacia  Corporation ("Pharmacia") and Solutia, Incorporated ("Solutia"), state:

### OVERVIEW

This case is brought by thousands of people claiming that defendants  intentionally exposed them to the now-outlawed human carcinogen, polychlorinated biphenyls ("PCBs").

Each of the Plaintiffs reside in, resided in, or regularly visited the poor area around the Monsanto chemical plant in Anniston, Alabama.   The plant was one of only two PCB manufacturing plants in the United States.

This case is brought in this division of the Northern District, which is the proper division rather than the Eastern Division, in order to avoid the due process issues repeatedly raised by Monsanto concerning an Anniston trial. See Ex parte Monsanto Company 794 So.2d 350 (Ala. 2001) (stating  "we are concerned about the potential bias created by the numerous newspaper articles and the extensive television news coverage of this case, and the possibility that Calhoun

973152

County citizens, while serving as jurors, could come to consider themselves in harm's way because of the alleged wrongdoing by Monsanto").

## PARTIES AND JURISDICTION

1.      Each of the plaintiffs reside in, have resided in, or have regularly visited the area around Monsanto's plant and have been exposed to PCBs released by defendants.  Plaintiff Antonia Tolbert resides in and is a citizen of Tuscaloosa County, Alabama.  She grew up at 226 Elston Avenue, Anniston, Alabama, in the immediate vicinity of Monsanto plant.  The names of the other plaintiffs are listed on APPENDIX A.  Where under nineteen, the names of their next friends by whom they sue are also listed on APPENDIX A.  All of the plaintiffs or representatives are citizens of states other than Delaware, Missouri, or New Jersey.

2.      The former Monsanto Company was a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri.  The former  Monsanto now consists of Monsanto, Pharmacia, and Solutia.  Defendant Solutia is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in St. Louis, Missouri.  Solutia is a 1997 spin-off of the former Monsanto Company.  Pharmacia is a corporation organized and existing under the laws of Delaware with its principal place of business in New Jersey.  The former Monsanto Company was merged into and became a part of Pharmacia in 2000.  The current Monsanto Company is a 2001 spin-off of Pharmacia.  The defendants are herein collectively referred to as "Monsanto."  Each of them is responsible for the actions of the former Monsanto.

3.      Diversity jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 in that the parties are citizens of different states and the amount in controversy with respect to each plaintiff exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4.     Federal question jurisdiction under 28 U.S.C. § 1331 exists over the plaintiffs' federal claims under  42 U.S.C. § 9607(a) and 42 U.S.C. § 9613(g)(2) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA).  Additionally, this Court has supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.

5.     Venue is proper in the Northern District of Alabama because all the defendants are corporations which are subject to personal jurisdiction in the Northern District.  In addition, the events and omissions giving rise to the claims occurred primarily in the Northern District.

6.     Venue is appropriate in the Western Division of the Northern District because one or more of the plaintiffs reside in the Western Division and because defendants have repeatedly argued that newspaper coverage (primarily the Anniston Star) and television coverage in the Eastern Division of the Northern District has caused serious due process issues with respect to a jury trial in or near Anniston, Alabama.  For example, in Ex Parte Monsanto, 794 So. 2d 350, 353 (Ala. 2001), a case involving the same plant, same time period, and same pollution, the Alabama Supreme Court summarized these same defendants' arguments as follows:

> "In its motion, Monsanto gave the following reasons for requesting a transfer of the cases: the difficulty of selecting a jury in Calhoun County because of the connection of a large number of the plaintiffs to Calhoun County and their relationships with potential jurors; what Monsanto claims is the "overwhelming" pretrial publicity this case has received in newspaper articles about the case and in televised news broadcasts aired on stations that would have been seen by viewers in Calhoun County; and what Monsanto refers to as the difficulties in finding potential jurors willing to commit the time it was estimated it would take to try these cases.  In support of its motion, Monsanto filed videotapes of television news coverage of these cases, as well as copies of numerous newspaper articles dealing with issues presented in these cases."

As a result of Monsanto's argument, the Alabama Supreme Court stated: "we are concerned about the potential bias created by the numerous newspaper articles and the extensive television news coverage of this case, and the possibility that Calhoun County citizens, while serving as

jurors, could come to consider themselves in harm's way because of the alleged wrongdoing by Monsanto." The Alabama Supreme Court directed the trial court to "carefully consider Monsanto's motion to change venue." In <u>Owens v. Monsanto</u>, No. CV96-J-0440-E, on February 27, 2001, defendants asked United States District Judge Inge Johnson to exclude from the jury venire all residents of Calhoun County, the county in which Anniston, Alabama, is located and where the United States District Court for the Northern District of Alabama, Eastern Division, is held.

<u>**SUBSTANTIVE AVERMENTS**</u>

7.     This action concerns defendants' pollution of neighborhoods with a toxic substance known as polychlorinated biphenyls or "PCBs."

8.     PCBs are carcinogenic materials which were manufactured by defendants for use as insulation in electrical transformers and other commercial purposes such as pesticides, hydraulic fluid, paint, newsprint and coils in deep fat fryers. PCBs were favored by the electrical industry because they were non-flammable and could conduct heat without conducting electricity.

9.     Defendants were the sole United States manufacturers of PCBs. All PCBs manufactured by defendants in this country were manufactured at two plants; one was located at Anniston, Alabama, and the other was in Sauget, Illinois.

10.     At all times, defendants had superior knowledge concerning PCBs and the manufacture and disposal of PCBs.

11.     PCBs are hazardous to humans and the environment. PCBs remain toxic and do not readily break down in the environment. As set out in more detail below, numerous tests and empirical evidence show that PCBs cause cancer, neurological deficits, liver disease, adverse

skin conditions and other maladies in humans, as well as disease and death of several species of wildlife (some to the point of extinction).

12.    Because of the longevity of PCBs and their hazardous effects on humans and the environment, the United States government officially banned production of PCBs in the 1970s.

### Defendants' Production And Improper Disposal Of PCBs

13.    Defendants manufactured PCBs from the 1930s until the mid-1970s.    The production of PCBs by defendants was "highly profitable" for the companies.

14.    The manufacture of PCBs was a dry process, meaning that it did not require the use of water from public water systems, sewers or natural sources of water.

15.    During the more than 40 years that PCBs were produced at the Anniston plant, defendants routinely and intentionally, or otherwise recklessly, disposed of the PCBs and related toxic substances in a manner which endangered, and continues to endanger, human health and the environment.

16.    Specifically, defendants routinely dumped excess PCBs and acid containing PCBs into the plant's sewer system, which discharges directly into ditches around the plant.    These ditches frequently flood, carrying PCBs and other toxins onto surrounding property.

17.    Defendants routinely dumped PCBs and PCB-contaminated substances into crude landfills located on their property.    They failed to monitor or maintain those landfills.    They distributed these substances elsewhere in the area.

18.    As a result of defendants' improper and reckless lack of control and disposal of PCBs, PCBs were discharged into the atmosphere, soil and waterways.    This improper activity took place for many years without any corrective action being taken and has resulted in the contamination of the surrounding land and waters even many miles away.    As shown below, this contamination of the environment continues today.

## Defendants' Knowledge Of The Hazards Of PCBs

19.     Defendants at all times relevant hereto knew of the hazards of PCBs but, because of the profitability of the enterprise, continued to manufacture and release and/or improperly dispose of PCBs at the Anniston plant.

20.     From the early days of PCB manufacturing, defendants recognized that PCBs were hazardous materials.  As early as the 1930s, defendants were aware that PCBs caused skin and liver disorders.  In the 1940s, scientists found that PCBs were linked to serious liver disorders in workers in wire and cable mills where PCBs were handled.

21.     In the 1950s, reports showed that prolonged exposure to PCBs caused liver problems.  In 1955, defendants recognized: "We know [PCBs] are toxic but the actual limit has not been precisely defined."  (Ex. A).  In fact, defendants specifically prohibited their workers from eating lunches in the manufacturing areas of the chemical plant due to the dangers of PCBs.  Thereafter, defendants, the U.S. government and others conducted numerous tests related to PCBs which confirmed the toxicity and dangers of PCBs.

22.     Defendants learned in 1968 that 1300 people in Japan had become ill after eating PCB-contaminated rice oil.  They learned in 1970 that cows in Ohio ingesting grain from silos painted with paints containing PCBs produced PCB-contaminated milk.  By the same time, defendants had received reports that PCBs in humans caused cancer, liver damage and problems with the reproductive process.

23.     In 1969, defendants concluded that "there is little probability that any action that can be taken will prevent the growing incrimination of specific [PCBs] as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds."

973152                                              6

24.     A 1974 report by the National Institute for Occupational Safety & Health sent to defendants wrote that "a tremendous quantity of research has demonstrated that environmental exposure to [PCBs] causes serious impairment of the functions of the liver." (Ex. B).

25.     A 1975 report by the United States Environmental Protection Agency sent to defendants confirmed that PCBs "pose a threat to human health and the environment." (Ex. C).

26.     Defendants knew PCBs were hazardous but manufactured and profited from them for more than 40 years with conscious disregard for the rights of others.

<u>**Defendants' Knowledge That They Were Polluting**</u>

<u>**The Land Surrounding The Anniston Plant**</u>

27.     At all times relevant hereto, defendants knew that their method of handling and disposing of PCBs at the Anniston plant was uncontrolled and improper and knew that this was causing pollution of the land around the plant and the waters below the plant.

28.     In internal memoranda, defendants' officials acknowledge that "the waters in receiving streams below the Anniston plant contain significant (parts per million) concentrations of PCBs.  More ominous perhaps is the fact that sediment in the bottom of these streams miles below our plants may contain up to 2% [PCBs]." (Ex. D, p. 8).  Defendants' officials warned that "The Dept. of Interior and/or State authorities could monitor plant outfall and find ppm of [PCBs] at Anniston anytime they choose to do so.  This would shut us down depending on what plants or animals they choose to find harmed." (Ex. E, p. 6).

29.     In a letter dated October 12, 1970, defendants, addressing the "(PCB) environmental pollution problem" wrote that they could "no longer dump scrap [PCBs] or spent transformer [PCBs] down the sewer.  Indiscriminate dumping of such material can lead to serious repercussions for the electrical industry." (Ex. F).

30.     In another memo, defendants acknowledged that it has become "increasingly obvious that high levels [of PCBs] would continue because of the PCBs trapped in the soil and in the sewer systems. Clean-up of these sources can be economically impractical. . . . It appears that the PCB contamination is so widespread that all of the plant's effluent must be treated. This would result in a system more complex and costly than anyone had anticipated . . . ." (Ex. G).

31.     Despite their knowledge, defendants continued to manufacture PCBs and failed to warn plaintiffs of the dangers of PCBs which had polluted the area around the Anniston chemical plant. Further, defendants did not attempt to clean up the environmental pollution they had caused and instead attempted to continue the production and/or release and/or disposal of PCBs.

### Defendants' Efforts To Conceal The Existence And Hazards Of PCBs

32.     With full knowledge of the hazards of PCBs and the pollution of the soil around the Anniston plant, defendants made the conscious decision to suppress and conceal these facts from the public and plaintiffs in order to maintain sales and to avoid liability, publicity, and other adverse consequences of their actions. Most egregiously, instead of attempting to warn the public and to clean up the environment, defendants set out to sell even more PCBs. At all times, defendants had knowledge superior to that of the state and the public concerning the true hazards of PCBs and the extent of the environmental pollution caused by defendants.

33.     In 1969, defendants appointed an "ad hoc" committee on PCBs to address the "situation concerning environmental contamination through the manufacture and use of [PCBs]."

34.     The purpose of the committee was to implement a plan to conceal material information from the public while at all times seeking to increase profits from the sales of PCBs. The stated objectives of the committee were to "Protect continued sales and profits of [PCBs]" and "Protect the image" of defendants in order to "Permit continued development of new uses and sales" of PCBs. (Ex. D, p. 1).

973152                                                          8

35.     A memo setting out these objectives candidly acknowledged that "there is little probability that any action that can be taken will prevent the growing incrimination of specific [PCBs] as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds."  (Id. at 2).  In the face of these admitted environmental hazards, the committee suggested "a number of actions which must be undertaken to prolong the manufacture, sale and use of these particular [PCBs] as well as to protect the continued use of other members of the [PCB] series."  (Id.).  Defendants were very concerned about their profits: "There can not be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds."  (Id. at 11).

36.     Defendants established early on a company policy to "[g]ive no statements or publications which would bring the [PCB] situation to the public's attention."  (Ex. H).

37.     As part of their scheme to conceal, defendants set out to "cooperate" with government authorities in confidential discussions that were not disclosed to the public or to plaintiffs.  Defendants touted their efforts to decrease the release of PCBs from the plant into the environment while failing to do anything about the pollution that had already occurred as a result of years of improper disposal.  Defendants, who had superior knowledge unknown to the authorities, failed to fully disclose to governmental authorities, including Alabama authorities, the extent of the pollution near Anniston and the long term adverse effects of PCBs already discharged into the environment.  As a result, Alabama authorities did not comprehend the seriousness of the situation. (Id.).

38.    In like manner, defendants decided to inform certain corporate customers of potential problems with PCBs while failing to disclose the long term effects on the environment. (See Ex. D, p. 6) ("As the alarm concerning the contamination of the environment grows it is almost certain that a number of our customers or their products will be incriminated.   The company could be considered derelict, morally if not legally, if it fails to notify all customers of the potential implication.").

39.    While deciding to confidentially inform certain governmental authorities and certain corporate customers of the potential dangers of PCBs, defendants made no effort to disclose to the public, including plaintiffs, the dangers of PCBs and the fact that the land around Anniston and the waters below had been contaminated with PCBs which will exist for years in the soil, sediment, and water.

40.    Indeed, defendants sought to conceal the extent of the problem from Alabama citizens.   In November 1970, when contacted by the Anniston Star, defendants falsely represented that there was not "any cause for worry from the public health standpoint." Defendants falsely represented that "no major quantities of PCBs leave the plant," and they wrongfully failed to disclose that even if the discharges ended immediately, dangerously high and unacceptable levels of PCBs would remain indefinitely in the waters and wildlife.   At the same time, defendants issued a press release claiming that losses of PCBs from manufacturing plants had been "negligible" when defendants' own documents show that the losses over the last 40 years had been substantial and that the then-current release was more than 88 pounds of PCBs per day.   Further, the attempts to decrease the release of PCBs were unsuccessful as high levels of PCBs in the waters and sediment continued to be recorded by defendants' own scientists.

41.     In 1975, a supposedly independent laboratory hired by defendants to study the effects of PCBs issued a report on cancer caused by PCBs in laboratory rats. The "independent" lab concluded in its report that PCBs were "slightly tumorigenic." To conceal this information, defendants requested the lab to change and falsify the report by changing the description of PCBs from "slightly tumorigenic" to "does not appear to be carcinogenic" in order to avoid adverse publicity.  (Ex. I).   Similarly, defendants ordered the adulteration of allegedly "independent" environmental reports describing conditions at the Anniston plant as "hazardous" and "contaminated." (Ex. J).

42.     Defendants' plan succeeded, and through the early 1970's they continued to profit from the sales of PCBs while at all times failing to warn of the pollution of the area surrounding the Anniston plant. Only the threat of a national ban on production and the pressure of the United States government stopped defendants from continuing to manufacture PCBs in Anniston. Even after discontinuing the manufacture of PCBs at the Anniston plant, defendants continued to manufacture PCBs in Sauget, Illinois. The ban on production, however, was too late because the damage to the environment had already been done. Moreover, as shown below, defendants continue to discharge PCBs into the environment, thus exacerbating the contamination problem in and around the Anniston area.

### Defendants' Continued Pollution Of The Waters
### And Land And The Lasting Effects Of PCBs

43.     PCBs discharged into the environment over a period of 40 years by defendants polluted the land in the area of the Anniston plant and the waterways below the Anniston plant. Because of their longevity, PCBs continue to exist in the environment.

44.     The situation is worsened by defendants' continuing failure to acknowledge the problem. Defendants failed and continue to fail to properly monitor and clean up their property,

which has resulted in the discharge of more PCB pollutants into the area surrounding the Anniston plant due to run-off, leaking landfills and dust from defendants' construction and demolition activities.

45.    High levels of PCBs have been found around the plant.  PCBs were found in the summer of 1998 in storm water samples taken from ditches leading from the plant.  The land all along these ditches is also heavily contaminated with PCBs.  In one area along the ditch, consultants found more than 200,000 ppm (parts per million) of PCBs in the soil.  Under federal guidelines, any substance containing 50 ppm or more of PCBs has to be disposed in a special hazardous waste landfill such as Emelle.  A draft consultation report prepared by the Alabama Department of Public Health states that the land around the plant and adjacent to plaintiffs' property should be deemed a public Health Hazard.  Fish advisories have been posted fifty miles down stream.

46.    Despite the acknowledged existence of PCBs in the area surrounding the Anniston plant, defendants have refused to remove the PCBs from their landfills and to clean up contaminated soil.  Indeed, until other lawsuits were brought against them, defendants essentially made no meaningful effort to clean up or alleviate the environmental hazard they had caused or to otherwise warn the public, even after production of PCBs ceased in the 1970s, and even after the national ban on production by the U.S. government.  Instead, defendants attempted to close their eyes to the problem.

### The "Buy Out"

47.    Once defendants were "caught" and lawsuits were filed in the 1990s, defendants began to take action.  Rather than acknowledge the problem, defendants have waged a vigorous defense to all claims of PCB contamination and denied any wrongdoing.  Most egregiously, defendants still delay and  refuse to clean up the environmental pollution they caused.

973152                                   12

48.     To aid in their defense, defendants initiated a "buy out" plan whereby defendants purchased some residential property around the Anniston plant, which is undisputedly contaminated with PCBs. Defendants went door-to-door attempting to convince residents of the low-income neighborhood to sell their property at inflated rates and to move away, thereby decreasing the number of possible plaintiffs and witnesses and concealing the evidence of the extent of pollution of the area with PCBs. The direct result of this "buy out" program was the destruction of the community and immediate neighborhood and further harm to the surrounding neighborhoods.   The increased dust, storm water runoff, and mud created by defendants' demolition of the properties they purchased continues to contaminate the area surrounding the Anniston plant. PCB levels in dust sampled in the area, including dust from inside some homes, is extremely high.

**Damages**

49.     Plaintiffs have suffered personal injuries and property damage as a result of defendants' tortious and wrongful acts. Each plaintiff with PCBs in his or her body has suffered present personal injury in the form of cellular, subcellular, and other personal injuries. Each plaintiff whose mother was exposed to PCBs while pregnant has suffered personal injuries in the form of neurological deficits. Other plaintiffs have suffered other personal injuries and illnesses. Additionally, plaintiffs have suffered loss of enjoyment of life and use of their property and residences. Among other things, plaintiffs here have been warned not to eat the local fish; not to eat the local clay (a local custom); not to allow their children to play in the local ditches, waterways or even on the contaminated ground of their own homes. The have been told by the United States Government not to eat or drink while working in their gardens because PCB-contaminated soil and dust could get on the food or drink. (See Exhibit K). They have been told not to work in their garden on windy days because PCB-contaminated dust "can be stirred up and

get in your nose or mouth"; to be "sure to wash your hands and work clothes to remove dust and dirt after gardening"; and to "take off your shoes at the door to avoid tracking soil into your home." (Id.). The Government further warns that garden-grown vegetables should be soaked overnight in water; thoroughly washed with vinegar, and scrubbed before eating. (Id.). To "help reduce [the] potential for exposure," plaintiffs have been instructed to eat a mix of vegetables from both their own garden and the market. (Id.).

### Federally Required Commencement Date

50.     In the factual allegations and counts in this Amended Complaint, Plaintiffs assert claims under State law for personal injury, or property damages, which are caused or contributed to by exposure to PCBs, which are a hazardous substance, or pollutant or contaminant, that were released into the environment from the defendants' facility. If the commencement date for any of Plaintiffs' State law claims is earlier than the federally required commencement date provided in 42 U.S.C. § 9658(1), the federally required commencement date governs Plaintiffs' claims.

### COUNT I

### NEGLIGENCE

51.     Plaintiffs incorporate by reference paragraphs 1 through 50 as if fully restated herein.

52.     Defendants negligently manufactured and disposed of PCB pollutants into the area surrounding the Anniston plant. Defendants failed to properly supervise the manufacture and disposal of PCBs and the demolition of the neighborhood surrounding the Anniston plant. Defendants failed and continue to fail to properly monitor and clean up their property and landfills, thereby negligently allowing the further discharge of PCBs onto the properties around the plant, where plaintiffs live, have lived, or regularly visit.

973152                                14

53.     Defendants owed plaintiffs a duty to use due care, and defendants breached this duty by their actions and inactions.

54.     As a direct and proximate result of defendants' negligence, plaintiffs have been damaged, and this injury was foreseeable.

WHEREFORE, PREMISES CONSIDERED, plaintiffs seek from defendants actual and compensatory damages, together with interest, costs and such other relief which plaintiff may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT II

### GROSS NEGLIGENCE, RECKLESSNESS, WANTONNESS

55.     Plaintiffs incorporate by reference paragraphs 1 through 54 as if fully restated herein.

56.     As more specifically described above, defendants have known of or consciously disregarded the hazards of PCBs, the discharge of PCBs into ditches and on the surrounding land, and the effect of their improper disposal of PCBs on plaintiffs.

57.     Defendants consciously and deliberately released these toxins by improperly dumping PCBs into the sewer. Defendants consciously and recklessly failed to monitor PCBs buried on their property. Defendants continue to consciously allow PCBs to escape their contaminated land through storm water runoff and airborne dust, thereby contaminating the surrounding area.

58.     Defendants have consciously and deliberately allowed these toxins to flow from their property and remain in the environment with the full understanding of the dangers and consequences to plaintiffs. For many years, defendants concealed the dangers and existence of PCBs in the soil and waters from the public, including plaintiffs. With superior knowledge, defendants had a duty of disclosure which they violated. This conduct constitutes gross

negligence, recklessness and/or wantonness which has been and continues to be a direct and proximate cause and/or contributing cause of the damages and injuries sustained by plaintiffs.

59.     The acts of defendants are intentional, willful, wanton, illegal, and done with conscious and deliberate disregard for the life, safety, and rights of plaintiffs and others, and, as a result of these acts of defendants, plaintiffs are entitled to punitive damages.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants actual, compensatory and punitive damages, together with interest, costs and such other relief which plaintiff may be justly entitled to receive, said damages to be more specifically proved at trial.

### COUNT III

### BREACH OF DUTY TO WARN

60.     Plaintiffs incorporate herein by reference paragraphs 1 through 59, as if fully restated herein.

61.     Defendants have participated in the manufacture, creation, production or use of PCBs and other related pollutants, and the release and dispersal of such pollutants into the area surrounding the Anniston plant.   Having created this hazard to human health and the environment, defendants had a continuing duty to warn the plaintiffs of the inherent danger of the manufacture, creation, production, use, release and dispersement of these toxic chemicals. Defendants had superior knowledge as to the presence and risk of PCBs.  The defendants' failure to warn the plaintiffs and members of the surrounding community was negligent, willful, wanton and in gross disregard for life, safety, and rights of the plaintiffs and is a direct and proximate cause of injuries and damages to the plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from the defendants actual, compensatory and punitive damages, together with interest, costs and such other relief to which

973152                                       16

the plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT IV

## FRAUD, MISREPRESENTATION AND DECEIT

62.     Plaintiffs incorporate herein by reference paragraphs 1 through 61, as if fully restated herein.

63.     The acts of defendants in misrepresenting and concealing the longevity of PCBs, and their release, dispersal and presence in the area surrounding the Anniston plant, and the health risks associated with PCBs, as well as Monsanto's false statements as more specifically alleged above, constitute fraud, misrepresentation and deceit, in violation of Ala. Code §§ 6-5-100 through 6-5-104.   Plaintiffs relied on the misrepresentations and concealment to their detriment.  The fraud, misrepresentation and deceit of the defendants is a direct and proximate cause of the injuries and damages to the plaintiffs as alleged above.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from the defendants actual, compensatory and punitive damages, together with interest, costs and such other relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT V

## BATTERY

64.     Plaintiffs incorporate herein by reference paragraphs 1 through 63, as if fully restated herein.

65.     Defendants have intentionally and continuously committed battery to each plaintiff's person by releasing toxic substances and pollutants that were of such a nature and character liable to produce injury, in a manner which was likely to cause injury, and did in fact,

973152                                                           17

cause injury to the Plaintiffs. Defendants' deliberate act of releasing contaminates into the environment surrounding Anniston was done with the knowledge that such contamination would come into contact with the Plaintiffs and would harm the Plaintiffs. At no time did Plaintiffs consent to the injury inflicted upon them by Defendants. Defendants' battery is a direct and proximate cause of the Plaintiffs' injuries and damages to the Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from the defendants actual, compensatory and punitive damages, together with interest, costs and such other relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

**COUNT VI**

**ASSAULT**

66.    Plaintiffs incorporate herein by reference paragraphs 1 through 65, as if fully restated herein.

67.    Defendants have intentionally and continuously committed assault to each plaintiff's person by releasing toxic substances and pollutants that were of such a nature and character liable to produce injury, in a manner which was likely to cause injury, and did in fact, cause injury to the Plaintiffs. Defendants' deliberate act of releasing contaminates into the environment surrounding Anniston was done with the knowledge that such contamination would come into contact with the Plaintiffs and would harm the Plaintiffs. At no time did Plaintiffs consent to the injury inflicted upon them by Defendants. Defendants' assault is a direct and proximate cause of the Plaintiffs' injuries and damages to the Plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from the defendants actual, compensatory and punitive damages, together with interest, costs and such other relief to which

the plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT VII

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (OUTRAGE)

68.   Plaintiffs incorporate herein by reference paragraphs 1 through 67, as if fully restated herein.

69.   Defendants have intentionally inflicted emotional distress on each plaintiff by knowingly and willfully manufacturing, creating, producing, using, releasing and dispersing PCBs and other toxic substances and pollutants into the area surrounding the Anniston plant and by knowingly and willfully allowing those pollutants to remain in the environment without advising the plaintiffs of the serious dangers imposed thereby.  Defendants either intended to inflict emotional distress, or, in the alternative, knew or should have known that emotional distress was likely to result from their conduct.  Said conduct on the part of the defendants, which reaches beyond all bounds of human decency and is utterly intolerable in a civilized society, has caused extreme emotional distress and mental anguish on the part of each plaintiff and is a direct and proximate cause of injuries and damages to the plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from the defendants actual, compensatory and punitive damages, together with interest, costs and such other relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT VIII

### COMMON LAW STRICT LIABILITY

70.   Plaintiffs incorporate herein by reference paragraphs 1 through 69, as if fully restated herein.

71.    By manufacturing, producing, creating, using, releasing and dispersing toxic substances and pollutants into the area surrounding the Anniston plant and by allowing those pollutants to remain in the environment, the defendants have engaged in abnormally dangerous, ultrahazardous and inherently or intrinsically dangerous activities for which they are strictly liable to the plaintiffs.  Said conduct is a direct and proximate cause of injuries and damages to the plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from the defendants actual, compensatory and punitive damages, together with interest, costs and such other relief to which the plaintiffs may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT IX

## TRESPASS

72.    Plaintiff incorporates by reference paragraphs 1 through 71 as if fully restated herein.

73.    Defendants have intentionally, wantonly, recklessly, or with gross negligence, and continuously until the present have trespassed upon plaintiffs' property by releasing and dispersing toxic substances and pollutants onto plaintiffs' property and rendering said property less valuable, less profitable, and unmarketable.  Each trespass and each discharge was in wanton disregard of and with reckless indifference to the rights of plaintiffs as owners without legal excuse or justification.  Defendants have unlawfully or wrongfully interfered with the plaintiffs' possession of their property.  Defendants' trespass is a direct, immediate and proximate cause of injuries and damages to plaintiffs.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants present and future, actual, compensatory and punitive damages, including damages to the value of their

property, present and future, together with interest, costs and such other relief which plaintiff may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT X

## NUISANCE

74.   Plaintiff incorporates by reference paragraphs 1 through 73 as if fully restated herein.

75.   Defendants intentionally, wantonly, maliciously, wrongfully and illegally created a private nuisance. Defendants' conduct has and continues to interfere with plaintiffs' rights to use and enjoy their property and has and continues to cause the plaintiffs hurt, inconvenience, and damage, and loss of enjoyment of life.

76.   As a result of defendants' actions, plaintiffs have been and continue to be damaged.

WHEREFORE, PREMISES CONSIDERED, plaintiffs claim from defendants present and future, actual, compensatory and punitive damages, including damages to the value of their property, present and future, together with interest, costs and such other relief which plaintiff may be justly entitled to receive, said damages to be more specifically proved at trial.

## COUNT XI

## MEDICAL TESTING, MONITORING, AND TREATMENT

77.   Plaintiff incorporates by reference paragraphs 1 through 76 as if fully restated herein.

78.   Plaintiffs also assert that they are entitled to recover the costs of past and future medical monitoring, testing, and treatment as a separate claim for relief or alternatively as additional relief under each of the other claims for relief above.

## COUNT XII

### CERCLA COST RECOVERY

79.     Plaintiffs incorporate herein by reference paragraphs 1 through 78, as if fully restated herein.

80.     Defendants' plant in Anniston, Alabama, (the "Facility") is a "facility" as that term is defined in 42 U.S.C. § 9601 (9), to include "(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

81.     Defendants own and/or operate the Facility and/or owned or operated the Facility when PCBs were disposed of.

82.     PCBs are a hazardous substance.

83.     The release and/or threatened release of PCBs from the Facility have caused and will cause Plaintiffs to incur necessary response costs consistent with the national contingency plan.

84.     Defendants are jointly and severally liable to Plaintiffs for those response costs that Plaintiffs have and will incur.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs are entitled to judgment against the Defendants, jointly and severally, for response costs under 42 U.S.C. § 9607(a) and to a declaratory judgment against Defendants, jointly and severally, for future response costs under 42 U.S.C. § 9613(g)(2) of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA), as amended by the Superfund Amendments and Reauthorization Act of 1986 (SARA).

## COUNT XIII

## WRONGFUL DEATH

85.     Plaintiffs incorporate herein by reference paragraphs 1 through 84, as if fully restated herein.

86.     As a direct and proximate result of such negligence, and grossly negligent, wanton reckless, malicious and/or intentional conduct, said defendants caused certain deceased individuals severe bodily harm, including great physical pain and severe mental anguish and/or emotional distress, and death.

87.     All such acts and/or omissions of defendants' agents, servants and/or employees were performed within the line and scope of their duties for defendants.

WHEREFORE, plaintiff demands judgment against the defendants jointly and severally for punitive damages in an amount to be determined by the jury, for the wrongful death of those deceased individuals whose administrators and personal representatives have filed suit on behalf of the decedents' estates, plus costs.

## COUNT XIV

## INJUNCTIVE AND OTHER RELIEF

88.     Plaintiffs incorporate herein by reference paragraphs 1 through 87, as if fully restated herein.

89.     Plaintiffs seeks such injunctive and other relief as to which they may in equity be entitled.

D. Frank Davis
John E. Norris
Scott A. Boykin
Attorneys for Plaintiffs

OF COUNSEL:
BURR & FORMAN LLP
P.O. Box 830179
Birmingham, Alabama 35283-0719
(205) 251-3000

Jere L. Beasley
Rhon E. Jones
David B. Byrne, III
Attorney for Plaintiffs

OF COUNSEL:
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343

Robert B. Roden
Attorney for Plaintiffs

OF COUNSEL:
SHELBY & CARTEE
2956 Rhodes Circle
Birmingham, Alabama 35205
(205) 933-8383

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable of right by a jury.

Of Counsel

973152                                24

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served on the following by directing same to their office addresses through first-class, United States mail, postage prepaid, on this 31 the day of MAY , 2002:

Jere F. White, Jr.
Adam K. Peck
Harlan I. Prater, IV
William S. Cox, III
Suzanne Alldredge Fleming
Kevin E. Clark
LIGHTFOOT, FRANKLIN, WHITE & LUCAS
The Clark Building
400 20th Street North
Birmingham, Alabama 35203

J. Mark White
Julia S. Stewart
WHITE, DUNN & BOOKER
2025 Third Avenue North
Suite 600
Birmingham, Alabama 35203


OF COUNSEL